**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**WILLIAM SNYDER,**

    **Plaintiff,**

v.                                                                   Case No.  8:07-cv-1282-T-30TBM

**HOFFMAN-LAROCHE, INC., et al.,**

    **Defendants.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendants Hoffman-La Roche Inc.'s and Roche Laboratories Inc.'s (together, "Defendants") Renewed Motion for Summary Judgment (Dkt. 26), and Plaintiff's Opposition to the same (Dkt. 33).  The Court, having considered the Motion, Opposition, and supporting memoranda, and being otherwise fully advised in the premises, determines the Motion should be granted.

### Background

**I.     Joseph Snyder's Use of Accutane**

On January 2, 2008, this Court denied Defendants' motion for summary judgment as premature because the parties had not had adequate opportunity to conduct discovery. Defendants have now renewed their motion for summary judgment following discovery from the decedent Joseph Snyder's ("Snyder") treating physician.  Defendants argue that the warnings it provided to Snyder's treating physician were the same as those provided to the

treating physician in <u>Stupak v. Hoffman-La Roche, Inc.</u>, 2007 WL 2350561 (M.D. Fla. August 27, 2007). In <u>Stupak</u>, this Court held those warnings were adequate as a matter of law regarding the drug's potential to cause certain psychiatric side effects (including suicide, suicidal ideation and suicide attempts).

The material facts of this case are not in dispute.[1] On or about February 4, 2000, Dr. Robert E. Kalb, M.D. ("Dr. Kalb"), Snyder's dermatologist, first prescribed Accutane[2] to treat Snyder's severe acne condition. The initial course of treatment concluded in August of 2000. On or about March 13, 2001, Snyder began a second course of treatment, which concluded in or about September of 2001. On or about March 6, 2002, Snyder began a third course of Accutane treatment and continued use of Accutane until April 3, 2003.

On or about April 5, 2003, Snyder filled a prescription for Amnesteem following a visit with Dr. Kalb.[3] Amnesteem, a generic equivalent of Accutane, is not manufactured by Defendants. In a follow up visit with Dr. Kalb on or about September 2, 2003, Snyder informed Dr. Kalb that he had stopped taking Accutane sometime in April of 2003. Dr. Kalb did not write Snyder any additional prescriptions for Accutane, nor is there any record evidence that Snyder ingested Accutane after April of 2003. On February 28, 2005, Snyder committed suicide.

---

[1] In its Opposition, Plaintiff stated he "does not dispute the accuracy of defendants' factual recitation or the authenticity of the exhibits to their renewed motion for summary judgment." (Plaintiff's Opposition at Dkt. 33).

[2] Accutane is a prescription acne medication manufactured by defendants.

[3] The visit with Dr. Kalb occurred on April 3, 2003.

**II.     Accutane's Warnings**

In or about February of 1998, Defendants amended the physician package insert for Accutane to include the following warnings:

> **WARNINGS:** *Psychiatric Disorders***: Accutane may cause depression, psychosis, and, rarely, suicidal ideation, suicide attempts, and suicide. Discontinuation of Accutane therapy may be insufficient; further evaluation may be necessary. No mechanism of action has been established for these events (see ADVERSE REACTIONS).**
>
> . . .
>
> **ADVERSE REACTIONS: . . .**
> In the post-marketing period, a number of patients treated with Accutane have reported depression, psychosis, and, rarely, suicidal ideation, suicide attempts and suicide. Of the patients reporting depression, some reported that the depression subsided with discontinuation of the therapy and recurred with reinstitution of therapy (see WARNINGS).

(Exhibit E to Defendants' Renewed Motion for Summary Judgment; hereinafter the "1998 Package Insert"). These warnings were also included in (i) a "Dear Doctor" letter from Defendants to physicians dated February 19, 1998 (the "1998 Dear Doctor Letter"); (ii) the 1999 issue of the Physician's Desk Reference ("PDR"), and (iii) a February 25, 1998 "Talk Paper" issued by the FDA.

In addition, Defendants also distributed an information brochure to physicians entitled "Important Information Concerning Your Treatment with Accutane" (the "Accutane Brochure"). The Seventh Edition of the Accutane Brochure, which was approved by the FDA and published in 2000, contained the following language:

**During Your Treatment**

**IMPORTANT INFORMATION**

- YOU SHOULD BE AWARE THAT CERTAIN SERIOUS, UNWANTED EVENTS HAVE BEEN REPORTED IN ACCUTANE (ISOTRETINOIN) PATIENTS.  THE EVENTS INCLUDE:

- CHANGES IN MOOD, DEPRESSION, AND RARELY SUICIDAL THOUGHTS, SUICIDE ATTEMPTS AND SUICIDE.

In January of 2001, Defendants issued a Dear Healthcare Provider letter, which announced the dissemination of (i) an Informed Consent/Patient Agreement to be used by physicians prescribing Accutane, and (ii) a Medication Guide for pharmacists to distribute with Accutane prescriptions.  The Informed Consent/Patient Agreement, to be initialed and signed by patients, included the following language:

> **Do not sign this agreement if there is anything that you do not understand about the information you have gotten about using Accutane . . .**
>
> 4.  I understand that some patients, while taking Accutane or soon after stopping Accutane, have become depressed or developed other serious mental problems.  Signs of these problems include feelings of sadness, irritability, unusual tiredness, trouble concentrating, and loss of appetite.  Some patients taking Accutane have had thoughts about hurting themselves or putting an end to their own lives (suicidal thoughts).  Some people tried to end their own lives.  And some people have ended their own lives.  There were reports that some of these people did not appear depressed.  No one knows if Accutane caused these behaviors or if they would have happened even if the person did not take Accutane.  Some people have had other signs of depression while taking Accutane (see #7 below).
> Initials: _____ . . .
>
> 5.  Before I start taking Accutane, I agree to tell my health care provider if, to the best of my knowledge, I have ever had symptoms of depression (see #7 below), been psychotic, attempted suicide, had any

        other mental problems, or take medicine for any of these problems. Being psychotic means having a loss of contact with reality, such as hearing voices or seeing things that are not there. . . .

6.       Before I start taking Accutane, I agree to tell my health care provider if, to the best of my knowledge, anyone in my family has ever had symptoms of depression, been psychotic, attempted suicide, or had any other serious mental problems. . . .

7.       Once I start taking Accutane, I agree to stop using Accutane and tell my provider right away if any of the following happen. I:

- start to feel sad or have crying spells
- lose interest in my usual activities
- have changes in my normal sleep patterns
- become more irritable than usual
- lose my appetite
- become unusually tired
- have trouble concentrating
- withdraw from family and friends
- start having thoughts about hurting yourself/myself or taking your/my own life (suicidal thoughts)

Initials: \_\_\_\_ . . .

(Informed Consent, Exhibit L to Defendants' Motion for Summary Judgment). The Medication Guide, to be distributed by pharmacists, contained the following similar warnings:

**What is the most important information I should know about Accutane? . . .**

**Possible serious side effects of taking Accutane include *birth defects* and *mental disorders* . . .**

**Mental problems and suicide.** Some patients, while taking Accutane or soon after stopping Accutane, have become depressed or developed other serious mental problems. Signs of these problems include feelings of sadness, irritability, unusual tiredness, trouble concentrating, and loss of appetite.

>Some patients taking Accutane have had thoughts about hurting themselves or putting an end to their own lives (suicidal thoughts). Some people tried to end their own lives. And some people have ended their own lives. There were reports that some of these people did not appear depressed. No one knows if Accutane caused these behaviors or if they would have happened even if the person did not take Accutane.
>
>***All patients should read the section of the Medication Guide "What are the signs of mental problems?" . . .***
>
>**What are the signs of mental problems?**
>
>Tell your provider if, to the best of your knowledge, you or someone in your family has ever had any mental illness, including depression, suicidal behavior, or psychosis. Psychosis means a lack of contact with reality, such as hearing voices or seeing things that are not there. Also, tell your provider if you are taking medications for any of these problems.
>
>**Stop taking Accutane and tell your provider right away if you:**
>
>- start to feel sad or have crying spells
>- lose interest in your usual activities
>- have changes in your normal sleep patterns
>- become more irritable than usual
>- lose your appetite
>- become unusually tired
>- have trouble concentrating
>- withdraw from family and friends
>- start having thoughts about hurting yourself/myself or taking your/my own life (suicidal thoughts)

(Medical Guide, Exhibit M to Defendants' Motion for Summary Judgment).

### III.     Dr. Kalb's Knowledge of Warnings

According to Dr. Kalb, he first became aware of a possible link between Accutane and depression in the mid 1990's.[4] Prior to prescribing Snyder's first course of Accutane treatment, Dr. Kalb received and reviewed the 1998 Package Insert, the 1998 Dear Doctor Letter, the 1999 issue of the PDR, the February 25, 1998 FDA Talk Paper, and the Seventh Edition of the Accutane Brochure. Dr. Kalb testified that he discussed the risks and benefits of Accutane with Snyder before prescribing the drug, including specifically the risk of depression and suicide. Such discussion was consistent with his regular practice, as was his practice of providing each patient with a copy of the Seventh Addition Accutane Brochure. During Snyder's first course of Accutane treatment, Dr. Kalb monitored him for side effects, including signs and symptoms of depression, as was his regular practice.

Prior to Snyder's second course of treatment, Dr. Kalb received and reviewed the 2001 Dear Healthcare Provider letter, the Informed Consent/Patient Agreement, and the Medication Guide. Based on his medical judgment, Dr. Kalb did not provide the Informed Consent/Patient Agreement to his patients. Instead, Dr. Kalb would discuss the specific risks of depression and suicide orally with each patient. Dr. Kalb believed oral discussion was more effective than providing patients with an additional form. Furthermore, Dr. Kalb

---

[4] Dr. Kalb, a board certified dermatologist since 1986, has prescribed Accutane to approximately 1,000 patients. Dr. Kalb is a fellow of the American Academy of Dermatology, has been a clinical associate professor of dermatology at the State University of New York, Buffalo School of Medicine, and has authored roughly forty publications in the field of dermatology.

understood that his patients would receive the Medication Guide, which contained the same warnings, from their pharmacists along with their Accutane prescription.

Prior to prescribing Snyder's second and third courses of treatment, Dr. Kalb again discussed the risks and benefits of Accutane use. Dr. Kalb's discussion included the additional risks and warnings set forth in the Informed Consent/Patient Agreement. Throughout Snyder's second and third courses of treatment, Dr. Kalb continued to monitor him for symptoms of depression. According to Dr. Kalb, no symptoms of depression were reported or observed while Snyder was taking Accutane.

## IV.    Plaintiff's Claims

Plaintiff's Complaint alleges claims for negligence (Count I), wrongful death (Count II), strict products liability (Count III), failure to warn (Count IV), breach of implied warranty (Count V), breach of express warranty (Count VI), negligent misrepresentation (Count VII), fraudulent misrepresentation (Count VIII), and fraud by concealment (Count IX). Each of these claims is predicated upon Defendants' alleged failure to warn that Accutane could cause Joseph Snyder to commit suicide.

## **Summary Judgment Standard**

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an

otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. Id. Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in his or her favor. Id. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. Chelates, 477 U.S. at 324. The evidence must be significantly probative to support the claims. Anderson, 477 U.S. at 248-49.

This Court may not decide a genuine factual dispute at the summary judgment stage. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).

**Discussion**

In Stupak, this Court held the warnings contained within the 1998 Package insert and the 1999 PDR were adequate under Wisconsin law. Stupak, 2007 WL 2350561 at *1. Snyder resided and was prescribed Accutane in the State of New York. Accordingly, the Court must now consider whether Defendant's warnings were adequate under New York law.

Under New York law, a prescription drug manufacturer may avoid liability for injuries that would ordinarily render the manufacturer strictly liable by distributing proper directions and warnings with the drug. Golod v. Hoffman La Roche, 964 F. Supp. 841, 853 (S.D.N.Y. 1997). To avoid liability, a manufacturer must warn of "all potential dangers in its prescription drugs that it knew, or, in the exercise of reasonable care, should have known to exist." Id. (citing Martin v. Hacker, 628 N.E.2d 1308, 1311 (N.Y. 1993)).

New York courts have adopted the "learned intermediary" doctrine. Id. Pursuant to this doctrine, physicians act as "informed intermediaries" between manufacturers and patients regarding warnings for prescription drugs. Id.; Martin, 628 N.E.2d at 1311. Thus, a "manufacturer's duty to caution against a drug's side effects is fulfilled by giving adequate warning through the prescribing physician, not directly to the patient." Martin, 628 N.E.2d at 1311. New York courts recognize various means in which manufacturers may provide physicians with such warnings. Id. The most common are "(1) the inclusion in the Physicians Desk Reference, the annually updated encyclopedia of medications, of a formal description of each of a manufacturer's drugs, and (ii) the manufacturer's formal warning in

the package insert of a prescription drug." Id.

A court may hold a prescription drug warning to be adequate as a matter of law "if it provides specific and detailed information on the risks of the drug." Id. at 1312.  In considering the adequacy of a warning, a court "must examine not only the meaning and informational content but also the form and manner of expression." Id.  The factors a court should consider include "whether the warning is accurate, clear, consistent on its face, and whether it portrays with sufficient intensity the risk involved in taking the drug." Id.

A warning is accurate if it is "correct, fully descriptive and complete" and conveys "updated information as to all of the drug's known side effects." Id. at 1313.  A warning is clear if it is "direct, unequivocal and sufficiently forceful to convey the risk." Id.  An otherwise clear warning may be obscured by inconsistencies in other sections of a package insert that contradict or dilute the warning. Id.  However, "a court should consider the warning as a whole," and any vagueness "may be overcome if, when read as a whole, the warning conveys a meaning as to the consequences that is unmistakable." Id.

Plaintiff argues that Defendant's warnings are not direct, unequivocal and sufficiently forceful to convey the risk of suicide.  Plaintiff argues Defendants' warnings equivocate in stating that Accutane "may" cause depression and suicidal ideation, that emotional instability "may bear no relation to therapy," and that the side effect of suicide is "uncommon" and/or "rarely" occurs.  Moreover, Plaintiff argues that the Defendants' statement that "[n]o one knows if Accutane caused these [suicidal] behaviors" further dilutes the warning.

The Court does not agree. In evaluating Defendants' warnings, the Court recognizes that the level of the risk involved, death from suicide, requires a warning of the most serious degree. Martin, 628 N.E.2d at 1313. However, Defendants' warnings sufficiently convey the seriousness of this risk in an accurate, clear and consistent manner.

The February 1998 warnings specifically warn that Accutane treatment may cause suicide.[5] The statements that Accutane "may" cause suicide, or that such a result "rarely" occurs, do not diminish the seriousness of the warning. Moreover, the updated warnings provided to Dr. Kalb in the January 2001 Dear Healthcare Provider letter, the Informed Consent/Patient Agreement, and the Medication Guide specifically warned that some Accutane patients had ended their own lives despite a lack of depressive symptoms. Taken as a whole, the warnings clearly, accurately, and consistently conveyed to Dr. Kalb that Accutane might cause suicide, with or without prior symptoms of depression.[6]

Upon consideration, the Court concludes Defendants have established that the language of the Accutane warnings adequately warned against the precise risk in question,

---

[5]These warnings were contained in the PDR and Accutane package insert, specifically recognized in Martin as means for drug manufacturers to warn physicians of harmful side effects. Martin, 628 N.E.2d at 1311.

[6]During his deposition, Dr. Kalb was asked if he was aware of adverse reports relating to Accutane made through the FDA adverse even reporting system, in addition to adverse event data collected by defendants. Dr. Kalb testified that he was not aware of the adverse reports/data. Although Dr. Kalb testified that any information is useful in making treating decisions, he stated that he did not request the adverse event data because the "adverse reporting system of the FDA is probably the least reliable because the cases can't be confirmed or verified as to the potential causality," and that until the reports are "reviewed and presented in peer-reviewed form, it's very difficult to understand the validity of individual reports or large numbers of reports." (Kalb Dep. at 135-36).

suicide. Plaintiff has failed to establish a factual dispute as to the adequacy of the warnings. Accordingly, the Court concludes Defendants' warnings were adequate as a matter of law. Defendants are entitled to summary judgment as to Plaintiff's failure to warn claim (Count IV). See Martin, 628 N.E.2d at 1315.

Defendants argue that each of Plaintiff's remaining claims for relief is predicated upon Defendants' alleged failure warn. Defendants have cited New York case law holding that New York views negligence, strict liability and breach of warranty claims as equivalent when premised on a failure to warn. See Martin, 628 N.E.2d at 9, n. 1 (noting "[w]here liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent"); Wolfgruber v. Upjohn Co., 72 A.D.2d 59, 62, 423 N.Y.S.2d 95 (N.Y. App. Div. 1979), aff'd, 417 N.E.2d 1002 (N.Y. 1980) ("Regardless of the descriptive terminology used to denominate the cause of action (viz., 'strict liability' or 'negligence'), where the theory of liability is failure to warn, negligence and strict liability are equivalent."); Ruggles v. R.D. Werner Co., Inc., 203 A.D.2d 913, 914, 611 N.Y.S.2d 84 (N.Y. App. Div. 1994) (holding "[t]here is no basis for distinguishing between a cause of action for strict products liability and one for breach of the implied warranty of merchantability").

In addition, Defendants have cited to cases from other jurisdictions questioning the ability of a Plaintiff to plead what is essentially a failure to warn claim as an alternate cause of action. See In re Norplant Contraceptive Products Liability Litigation, 955 F. Supp. 700, 709 (E.D. Tex 1997) ("If the [learned intermediary] doctrine could be avoided by casting what is essentially a failure to warn claim under a different cause of action such as . . . a

claim for misrepresentation, then the doctrine would be rendered meaningless."), aff'd, 165 F.3d 374, 380 (5th Cir. 1999); Jack v. Glaxo Wellcome, Inc., 239 F. Supp. 2d 1308, 1320-22 (N.D.Ga. 2002) (holding the learned intermediary doctrine, as adopted by Georgia courts, insulated a defendant from liability for negligence, strict liability, and breach of implied warranty claims).

Defendants further argue that Plaintiff's wrongful death claim requires a showing that Defendants' alleged failure to warn caused Snyder's death. Pursuant to the New York wrongful death statute, a personal representative may maintain an action to recover damages for a wrongful act that caused a decedent's death. N.Y. EST. POWERS & TRUSTS § 5-4.1 (2003). Absent a showing that Defendants' warnings were inadequate, Plaintiff cannot establish liability. As the Court has determined Defendants' warnings were adequate as a matter of law, Plaintiff's wrongful death claim fails.

Plaintiff's Opposition focuses solely on the adequacy of Defendants' warnings. Plaintiff has failed to address Defendants' arguments regarding its additional claims for relief. Upon review and consideration, the Court agrees that the adequacy of the Accutane warnings entitles Defendants to summary judgment on all of Plaintiff's claims.

It is therefore ORDERED AND ADJUDGED that:

1. Defendants Hoffman-La Roche Inc.'s and Roche Laboratories Inc.'s Renewed Motion for Summary Judgment (Dkt. 26) is **GRANTED**.

2. The Clerk is directed to enter **Final Summary Judgment** against Plaintiff and in favor of Defendants Hoffman-La Roche Inc. and Roche Laboratories Inc.

3.   All pending motions are denied as moot.  The Clerk is directed to close this file.

**DONE** and **ORDERED** in Tampa, Florida on October 30, 2008.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2007\07-cv-1282.msj.frm